BETTY L. DAVIS,                          )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )    Civil Action No. 10-1157
                                         )
POINT PARK UNIVERSITY, SANDRA            )
  CRONIN, and BRIDGET MANCOSH,           )
                                         )
            Defendants.                  )


**MEMORANDUM OPINION**

Pending before the Court is a motion to dismiss pursuant to
Fed. R. Civ. P. 12(b)(6), filed by Defendants Point Park
University ("Point Park" or "the University"), Sandra Cronin,
and Bridget Mancosh. (Doc. No. 7, "Mot. Dis.") For the reasons
set forth below, the motion is granted in part and denied in
part.

**I. BACKGROUND**

A. Factual History[1]

Plaintiff Betty L. Davis worked for Point Park
University from November 10, 2008, through July 2, 2010, when,
according to the Complaint, her employment was terminated in

---

[1]     The facts in this section are taken from the Complaint.

retaliation for discovering certain accounting improprieties at the University.

Point Park is a private-non-profit university which operates two campuses in the Pittsburgh, Pennsylvania area. The University receives funding from a variety of federal agencies and through grants and awards from the Commonwealth of Pennsylvania and private sources.

In 2006, Defendant Bridget Mancosh became the Senior Vice President of Finance and Operations for Point Park. Ms. Mancosh's duties included overseeing development of the operating and capital budgets, financial reporting, collections, student financial aid, student accounts, and a number of other administrative functions.

Plaintiff Davis was Senior Director of Student Financial Services; her job duties included the day-to-day management, coordination, and supervision of Financial Aid and Student Account Directors. In her position, she acquired an understanding of the policies related to distributing and accounting for federal, state and private aid to Point Park students and the policies and procedures for billing and collection.

At the time of the events giving rise to this action, Defendant Sandra Cronin was Director of Financial Aid, reporting

2

to Ms. Davis. As such, she supervised the Point Park Financial Aid Office, ensured compliance with federal, state and institutional regulations, and implemented the policies and procedures of the University and the Finance Division.

According to the Complaint, Ms. Davis "discovered and/or witnessed numerous manipulated documents, formulas and procedures - all of which had been compiled by" Ms. Cronin, and "approved and/or adopted by" Ms. Mancosh and Point Park. (Complaint, ¶ 8.) Ms. Davis believed that as a result of these activities, Point Park had improperly claimed federal funds and failed to properly certify compliance with federal regulations. She also believed Ms. Cronin had excluded certain students from receiving Federal Supplemental Educational Opportunity Grant funds in violation of Department of Education regulations and had concealed this practice from the University auditors.

When Ms. Davis discovered these activities by Ms. Cronin, she went to Ms. Mancosh, her supervisor, to discuss her concerns. Ms. Mancosh acknowledged Ms. Cronin's "disobedience," but directed Plaintiff to "keep this quiet." (Complaint, ¶¶ 18-19.) At Plaintiff's urging, an independent audit was conducted which validated her suspicions, but no corrective action was taken by either Point Park or Ms. Mancosh as a result.

Soon thereafter, Ms. Cronin complained to Ms. Mancosh about many of Ms. Davis's actions. Ms. Davis, Ms. Mancosh and a representative from Point Park's human resources department met and all agreed that Ms. Cronin's complaints were unfounded. However, Ms. Davis was told at that meeting that her employment was being terminated, ostensibly as part of a University restructuring.

The elapsed time between the internal audit and Ms. Davis's termination was less than one month and also "mere days" before a scheduled federal audit. Had she been employed by Point Park when the federal audit was conducted, she would have been compelled to share her information with the auditors. Rather than risk disclosure of the "illegal goings-on" at Point Park, the University fired her in retaliation for discovering the improper accounting activities. (Complaint, ¶¶ 30-31.)

B. Procedural History

Plaintiff filed a two-count Complaint in this Court on August 30, 2010. First, she alleged that in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), her employment was terminated as a result of her complaints to her supervisor and her recommendation for an independent audit regarding the reports submitted by the University to various federal funding agencies. Second, her termination was the result of her making

4

(or being about to make) a good faith report of wrongdoing or waste to her employer or other appropriate authority. Under the circumstances of this case, her termination was a violation of the Pennsylvania Whistleblower Law, 43 P.S. § 1423(a) ("PWL.") As a result of her termination, Ms. David suffered emotional pain, mental anguish, and serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment.

On September 28, 2010, Defendants filed the now-pending motion to dismiss, arguing that the Complaint did not provide sufficiently detailed allegations to satisfy the requirements of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Instead, the Complaint consists only of legal conclusions without sufficient facts which would allow the Court to do more than infer "a mere possibility of misconduct." (Defendants' Memorandum of Law in Support of Motion to Dismiss, Doc. No. 8, "Defs.' Memo," at 1.)

The parties having thoroughly briefed their positions, the motion to dismiss is now ripe for decision.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiff's claims based on her allegations that Defendants retaliated against her in

violation of whistle-blower provision of the FCA, 31 U.S.C. §
3730(h)(2). Supplemental jurisdiction over the Pennsylvania
Whistleblower Act claim is provided through 28 U.S.C. § 1367(a).
Venue is appropriate in this District inasmuch as Defendants
reside in this district. 31 U.S.C. § 3732(a).

## III. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 8(a) requires that a
pleading which "states a claim for relief must contain. . . .
(2) a short and plain statement of the claim showing that the
pleader is entitled to relief." The Rule further provides that
"[e]ach allegation must be simple, concise, and direct" but
"[n]o technical form is required." Fed. R. Civ. P. 8(d). "The
touchstone of Rule 8(a)(2) is whether a complaint's statement of
facts is adequate to suggest an entitlement to relief under the
legal theory invoked and thereby put the defendant on notice of
the nature of the plaintiff's claim." In re Ins. Brokerage
Antitrust Litig., 618 F.3d 300, 2010 U.S. App. LEXIS 17107, *45-
*46, n.18 (3d Cir. Aug. 16, 2010) ("Brokerage Antitrust"),
*citing* Twombly, 550 U.S. at 565, n.10.

In the aftermath of Twombly and Iqbal, and the
interpretation of those two cases by the United States Court of
the Appeals for the Third Circuit in a series of precedential
opinions, the pleading standards which allow a complaint to

6

withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) have taken on slightly new parameters. Beginning in Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008), the Court of Appeals noted, "After Twombly, 'it is no longer sufficient to allege mere elements of a cause of action;' instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'" Phillips, 515 F.3d at 233, *quoting* Twombly, 550 U.S. at 563, n.8 (alteration in original.) In its next important case to address the standard for motions to dismiss, Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009) the Court of Appeals noted that following Twombly and Iqbal, conclusory "bare-bones" allegations that "the defendant unlawfully harmed me" no longer suffice. A civil complaint must now include "sufficient factual matter to show that the claim is facially plausible." Fowler, 578 F.3d at 210; *see also* Twombly, 550 U.S. at 555, holding that a complaint which offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." The Fowler court further directed that

> after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then

7

determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief."

Fowler, 578 F.3d at 210-211 (quotations and citations omitted.)

Thus, the current formulation of the standard of review for a motion to dismiss under Rule 12(b)(6) requires the court to determine if the plaintiff's claims are "plausible." "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949; see also Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009); Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010); and Bob v. Kuo, No. 10-1615, 2010 U.S. App. LEXIS 14965, * 4 (3d Cir. July 20, 2010). "[W]hat suffices to withstand a motion to dismiss necessarily depends on substantive law and the elements of the specific claim asserted." Brokerage Antitrust, 2010 U.S. App. LEXIS 17107 at *46, n.18. "Determining whether a complaint states a plausible claim for relief will. . .be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." Brokerage Antitrust, id. at *177, *quoting* Iqbal, 129 S. Ct. at 1950.

The Third Circuit's latest summation of the standard is that "[w[e must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom, but we require more than mere assertions devoid of further factual enhancement." Dawson v. Frias, CA No. 10-2200, 2010 U.S. App. LEXIS 21278, *2 (3d Cir. Oct. 14, 2010) (internal citations and quotations omitted.) "The assumption of truth does not apply, however, to legal conclusions couched as factual allegations or to '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" Bamigbade v. State Farm Mut. Auto. Ins. Co., Nos. 09-3868 and 09-4229, 2010 U.S. App. LEXIS 17033, *3-*4 (3d Cir. Aug. 9, 2010), *quoting* Iqbal, 129 S. Ct. at 1949. "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. The Supreme Court's formulation of the pleading standard in Twombly does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." McTernan v. City of York, 564 F.3d 636, 646 (3d Cir. 2009) (internal quotations omitted.)

9

## IV. DISCUSSION

### A. Count I: Retaliation in Violation of the FCA

Defendants argue that Plaintiff's claim of retaliation in violation of the False Claims Act must be dismissed because Ms. Davis fails to allege (a) that she engaged in "protected conduct" as that term is understood in the FCA and (b) that she placed Point Park on notice that she was contemplating filing a *qui tam* action[2] against it or reporting the University to the government for fraud. (Mot. Dis., ¶ 5.) At a minimum, Count I should be dismissed with regard to Ms. Cronin and Ms. Mancosh because there is no individual liability under the FCA. (Mot. Dis., ¶ 6; Defs.' Memo at 2, *citing* Palladino ex rel. United States v. VNA of S.N.J., Inc., 68 F. Supp.2d 455, 464 (D. N.J. 1999).)

Section 3730(h) of the FCA limits its scope to "employers," providing in relevant part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment **by his or her employer** because of lawful

---

[2] "The FCA authorizes private individuals to bring suit in the name of the United States [a *qui tam* action] to recover for alleged false or fraudulent claims submitted for payment to the United States." United States ex rel. Bogard v. King Pharms., 493 F.3d 323, 325, n.2 (3d Cir. 2007), *citing* 31 U.S.C. § 3730(b)(1). Here, Ms. Davis has not brought such a *qui tam* action, but relies on the provision of the FCA which prohibits an employer from retaliating against an employee who has filed such a suit or, as is discussed in the text above, has alerted the employer to the "distinct possibility" that he or she may file such a suit in the future.

acts done by the employee on behalf of the employee or
others in furtherance of an action under this section
. . .shall be entitled to all relief necessary to make
the employee whole.

31 U.S.C. § 3730(h) (emphasis added).

Plaintiff concedes there is no individual liability for
Defendants Mancosh and Cronin pursuant to the FCA and therefore
agrees that Count I may be dismissed as it applies to them.
(Plaintiff's Response and Opposition to Defendants' Motion to
Dismiss, Doc. No. 15, "Plf.'s Resp.," at 6.)

We begin our discussion of the FCA claims against Point
Park by summarizing the law which prohibits an employer from
retaliating against a whistle-blower employee who has filed (or
has given the employer reason to believe he is about to file) a
*qui tam* action alleging that the employer presented false or
fraudulent claims for payment by the United States Government.
Congress intended this portion of the statute to protect
"employees who assist the government in the investigation and
prosecution of violations of the False Claims Act," recognizing
that "[f]ew individuals will expose fraud if they fear their
disclosures will lead to harassment, demotion, loss of
employment or any other form of retaliation."   Hutchins v.
Wilentz, Goldman & Spitzer, 253 F.3d 176, 186 (3d Cir. 2001),
*cert. denied*, 536 U.S. 906 (2002) (internal citations and

11

quotations omitted.) To establish such a retaliation claim, the plaintiff must show "(1) he engaged in protected conduct (i.e., acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his protected conduct." United States ex rel. Hefner v. Hackensack Univ. Medical Ctr., 495 F.3d 103, 110 (3d Cir. 2007), quoting Hutchins, 253 F.3d at 186 (internal quotation marks omitted.) In the context of an FCA claim, "protected conduct" consists of actions taken "in furtherance of" a qui tam action. That is, there must be a "nexus" between the conduct and the federal action. Hutchins, 253 F.3d at 187 (internal citations, quotations and alterations omitted.) As discussed in Hutchins and reiterated in Dookeran v. Mercy Hosp. of Pittsburgh, 281 F.3d 105, 108 (3d Cir. 2002), the phrase "taken in furtherance of an FCA action" does not require the employee to have actually filed a FCA suit in order to assert claim of retaliation under § 3730 nor even to have developed a "winning FCA case." Hutchins, id. at 187-188, see also Dookeran, id. However, if there is no way the plaintiff's conduct "could reasonably lead to a viable FCA action, then the whistle-blower provision provides [her] no protection." Dookeran, 281 F.3d at 108.

As pointed out in Campion v. Northeast Utils, 598 F. Supp.2d 638 (M.D. Pa. 2009), the statute "protects a wide

12

variety of conduct, 'including investigation for, initiation of, testimony for, or assistance in,' an FCA claim, and '[d]etermining what activities constitute 'protected conduct' is a fact specific inquiry." Campion, 598 F. Supp.2d at 648, *quoting* Hutchins, 253 F.3d at 187; *see also* United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 236 (1st Cir. 2004) ("protected activity" should be interpreted broadly.)

Section 3730 covers actions taken while the employee is "collecting information about a possible fraud, before [she] has put all the pieces of the puzzle together." Campion, id. at 657, *quoting* Hutchins, id. at 187-188. The act of assembling the puzzle can include "internal reporting and investigation of an employer's false or fraudulent claims," but does not extend so far as to include "mere dissatisfaction" with the plaintiff's treatment on the job or an investigation "of nothing more than [her] employer's non-compliance with federal or state regulations." Campion, id. (internal citations omitted.) The investigation (1) must concern "false or fraudulent claims" and (2) at a minimum, there must be "a distinct possibility that a viable FCA action could be filed." Campion, id. *citing* Dookeran, 281 F.3d at 108, and United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998).

13

A further refinement of the "protected conduct" prong applies when the plaintiff's assigned job duties include investigation and reporting of possible fraud within the organization. This is best illustrated in cases like Hutchins where the plaintiff, a paralegal for the defendant law firm, was assigned the responsibility to investigate certain client bills which were suspiciously high. Hutchins's investigation showed that the firm had a policy to bill the client 150% of actual research expenses and that paralegals performed secretarial tasks, resulting in charges at an unnecessarily high rate. Hutchins, 253 F.3d at 179-180. The plaintiff was subsequently fired and claimed his termination was in retaliation for having exposed these practices to his superiors. The district court concluded he had not engaged in protected conduct because his supervisor had specifically assigned him the task of investigating the firm's billing practices; that is, he had not been motivated by suspicions of fraud to carry out his own independent investigation, had not expressed any objection to the practices he discovered, and had not notified his employer that he "might be reporting them." Id. at 187. The Court of Appeals agreed with the lower court's decision, quoting with approval the holding of Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868 (4th Cir. 1999):

14

> "If an employee is assigned the task of investigating
> fraud within the company, courts have held that the
> employee must make it clear that the employee's
> actions go beyond the assigned task [in order to
> allege retaliatory discharge under § 3730(h)]." The
> court stated that when an employee is assigned the
> task of investigating fraud, "such persons must make
> clear their intentions of bringing or assisting in a
> [False Claims Act] action in order to overcome the
> presumption that they are merely acting in accordance
> with their employment obligations." Id. This
> requirement is consistent with the understanding that
> the employer must be put on notice that the employee
> is contemplating a potential False Claims Act suit
> before liability will attach under § 3730(h).

Hutchins, 253 F.3d at 191, also citing United States ex rel.

Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th

Cir. 1996) (clinical director whose responsibilities included

monitoring compliance with Medicaid requirements did not engage

in protected conduct when she reported non-compliance to her

supervisors), and Robertson v. Bell Helicopter Textron, 32 F.3d

948, 952 (5th Cir. 1994) (senior contract administrator

responsible for assuring that government funding requests were

properly substantiated did not engage in protected conduct

because his concerns about improper requests were nothing more

than "those typically raised as part of a contract

administrator's job.")

However, even if an employee's job duties include

investigating potential fraud, the employee may engage in

15

protected conduct and put the employer on notice of potential

FCA litigation

> by expressly stating an intention to bring a qui tam
> suit,. . .[or by engaging in] any action which a fact
> finder reasonably could conclude would put the
> employer on notice that litigation is a reasonable
> possibility. Such actions would include, but are not
> limited to, characterizing the employer's conduct as
> illegal or fraudulent or recommending that legal
> counsel become involved. These types of actions are
> sufficient because they let the employer know,
> regardless of whether the employee's job duties
> include investigating potential fraud, that litigation
> is a reasonable possibility.

Hutchins, 253 F.3d at 192, *quoting* Eberhardt, 167 F.3d at 868

(senior staff vice president whose duties included investigating

possible fraud had engaged in protected conduct when he reported

to his employer that certain charges were "illegal" and advised

the employer to obtain legal counsel); *compare* Hefner, 495 F.3d

at 110-111 (consultant hired to investigate Medicare

documentation and billing practices never talked with anyone on

employer's staff about his findings and thus had not put

employer on notice of possible litigation.)

Here, Plaintiff has alleged that her title at Point Park

was Senior Director of Student Financial Services, but she does

not describe her duties in that position other than the general

phrase "day-to-day management, coordination and supervision of

Financial Aid and Student Account Directors." (Complaint, ¶ 4.)

16

In that position, she acquired "an understanding of the appropriate policies and procedures for distributing and accounting for Federal, State and Institutional aid and appropriate student billing and collection policies and procedures." (Id.) At no point in her Complaint does Ms. Davis allege that she was assigned the responsibility to investigate whether Point Park was in compliance with the guidelines for distributing federal funds. To the contrary, she alleges that Ms. Cronin, as Director of Financial Aid, had that responsibility. (Complaint, ¶ 6, stating that Ms. Cronin "ensured compliance with federal, state and institutional regulations and/or guidelines.") Thus, there is nothing in the Complaint from which to infer, as Defendants argue, that investigating the accuracy of Ms. Cronin's compliance reports was within the scope of Plaintiff's responsibilities as Senior Director of Student Financial Affairs.[3]

A weak – but not fatal – point of the Complaint is whether there is a connection between Ms. Davis's act of bringing the alleged fraudulent activities to the attention of Ms. Mancosh

---

[3]    This does not, of course, preclude Defendants from eventually showing that in fact Ms. Davis's duties did include checking the accuracy of Ms. Cronin's work, which would be entirely in keeping with Plaintiff's responsibilities as Ms. Cronin's supervisor. However, at this stage, there is nothing to show Ms. Davis was acting within the scope of her normal duties when she discovered Ms. Cronin's allegedly improper activities.

and her eventual termination. In a FCA retaliation claim, the employee must also show that (1) the employer knew she had engaged in protected activity and (2) the "retaliation was motivated, at least in part, by the employee's engaging in that protected activity." Yesudian, 153 F.3d at 736 (internal quotation and alteration omitted.) That is, as the Court succinctly stated in Hutchins, the employer has to have been put on notice of the "distinct possibility" of FCA litigation. Hutchins, 253 F.3d at 188. This notice requirement "is essential because without knowledge an employee is contemplating a False Claims Act suit, there would be no basis to conclude that the employer harbored § 3730(h)'s prohibited motivation, i.e., retaliation." Id. at 186 (internal alterations omitted.)

Defendants urge that Count I should be dismissed because Ms. Davis did not allege that she informed them she contemplated reporting the alleged misconduct to the federal government nor that she was considering a possible *qui tam* case. They argue that she "created the impression to Defendants" that her focus was to resolve the problem of certain students not receiving a portion of federal funds. (Defs.' Memo at 9.) There is nothing the Court can perceive in the Complaint that supports the inference that her acts created such an impression and thus this argument is better left for summary judgment. And at this

stage, contrary to Defendants' argument, Ms. Davis need not allege that she filed a FCA claim or show that her suspicions would support "a winning case," but merely that her "activities could reasonably lead to a viable FCA case." *See* Dookeran, 281 F.3d at 108.

We do agree with Defendants that Plaintiff fails to allege any specific notification to Ms. Mancosh that she intended to pursue legal action based on her discovery of the "manipulated materials." Although she refers to having "communicated her findings of Defendant-Cronin's illegal activities," and Ms. Mancosh's direction to "keep this quiet," it is unclear how forcefully Ms. Davis made her position known, other than referring to certain actions as "illegal" and urging the independent audit. For instance, there is no allegation that she alerted Ms. Mancosh prior to her termination that she intended to assist the federal auditors if they raised questions about Point Park's reports to the funding agencies during the external audit. However, a plaintiff is not required to know that the possible fraudulent activity she is investigating could lead explicitly to a FCA suit. As the Court pointed out in Yesudian, if this were a requirement, "only lawyers, or those versed in the law – would be protected by the statute, as only they would know from the outset that what they were

investigating could lead to a False Claims Act prosecution."
Id. at 741 (citing cases); *see also* Hutchins, 253 F.3d at 189
("while an employer is entitled to treat a suggestion for
improvement as what it purports to be rather than as a precursor
to litigation, the employer is on notice of the 'distinct
possibility' of litigation when an employee takes actions
revealing the intent to report or assist the government in the
investigation of a False Claims Act violation" (internal
citation omitted.))

Plaintiff implies but does not clearly allege that after
the internal audit was completed and the federal audit
scheduled, she was fired to prevent her from cooperating with
the federal auditors and thereby revealing the fraudulent
activities. Such an external audit and Ms. Davis's possible
exposure of the University's practices could have raised the
specter of further official investigation, if not litigation, in
the minds of Plaintiff's superiors. In her memorandum opposing
the motion to dismiss, Ms. Davis has identified several other
actions Ms. Mancosh took which Plaintiff argues reflect her
knowledge that Ms. Davis could pursue a legal claim.
(Plaintiff's Memorandum in Support of Plaintiff's Response and
Opposition to Defendants' Motion to Dismiss, Doc. No. 14,
"Plf.'s Memo," at 11.)    However, it is a well-established

principle of federal pleading that a complaint may not be amended in such an ad hoc fashion. Pennsylvania ex rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (Internal quotation omitted.)

We agree Count I of the Complaint could be more explicit on certain points, however, we do not find that it should be dismissed as insufficient under Twombly and Iqbal. Accepting the factual allegations which support Count I and drawing "all reasonable inferences" from them, we find that Plaintiff has stated a plausible claim for retaliation under the FCA.

B. Count II: Violation of 43 P.S. § 1423(a)

The Pennsylvania Whistleblower Law provides:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 P.S. § 1423(a). Protection of employees.

Among their arguments, Defendants contend that the PWL claim against Ms. Cronin should be dismissed because Plaintiff fails to allege that Ms. Cronin meets the definition of

21

"employer" for purposes of the PWL. (Id., ¶ 9.)[4] Plaintiff concedes Ms. Cronin is not an "employer" as defined in the PWL,[5] and that Count II should be dismissed insofar as it applies to her. (Plf.'s Resp. at 6.) We do not therefore need to address this argument.

Defendants' primary argument is that Count II must be dismissed because Ms. Davis fails to allege facts to support Point Park's status as a "public body" under the Pennsylvania Whistleblower Law, 43 P.S. § 1422. (Mot. Dis., ¶ 8.) Not only does Ms. Davis admit that Point Park is a private, non-profit entity, she fails to allege that it has any affiliation with the Commonwealth of Pennsylvania. Moreover, merely amending her complaint to reflect that fact that the University receives "some funding" from the State would be insufficient to establish Defendant's liability as a public body or Plaintiff's status as an "employee of a public body." (Defs.' Memo at 10-12.) Ms.

---

[4]    Based on our decision regarding Count I, we need not address Defendants' third argument which is that if Count I is dismissed, the Court should decline to exercise supplemental jurisdiction over the PWL claim and dismiss Count II as well. (Mot. Dis., ¶ 10.)

[5]    As Director of Financial Aid, Ms. Cronin reported to Ms. Davis, the Senior Director of Student Financial Services. (Complaint, ¶¶ 3, 4, 6.) The PWL defines "employer" as "[a] person supervising one or more employees, including the employee in question; a supervisor of that supervisor; or an agent of a public body." 43 P.S. § 1422. Under this definition, if the PWL is applicable, Ms. Mancosh may be held liable but Ms. Davis's subordinate, Ms. Cronin, may not.

22

Davis counters that Pennsylvania case law supports the proposition that a private entity which receives state funding may qualify as a "public body" for purposes of applying the PWL. (Plf.'s Resp. at 6.) We agree with Ms. Davis on this point.

The Pennsylvania Whistleblower Law limits the scope of its protection to employees of "public bodies," a term which is defined as including:

(1) A State officer, agency, department, division, bureau, board, commission, council, authority or other body in the executive branch of State government.

(2) A county, city, township, regional governing body, council, school district, special district or municipal corporation, or a board, department, commission, council or agency.

(3) Any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body.

43 P.S. § 1422. Definitions.

Since it is clear Point Park University is not in the first two categories, Ms. Davis must establish that it was "either created by Commonwealth or political subdivision authority" or that it "is funded in any amount by or through Commonwealth or political subdivision authority." As Defendants point out, Plaintiff does not allege that the University was created either by the Commonwealth or by a city, county or other political

23

subdivision thereof, and Ms. Davis does not argue to the contrary in any of her pleadings in opposition to the motion to dismiss.

She does dispute, however, Defendants' position that the fact that the University receives state funding is insufficient to make it a "public body." (*See* Defs.' Memo at 11, *citing* Cohen v. Salick Health Care, Inc., 772 F.Supp. 1521, 1527 (E.D. Pa. 1991); Krajsa v. Keypunch, Inc., 622 A.2d 355, 360 (Pa. Super. Ct. 1993); and Brandau v. ACS, Inc., No. 03-6014, 2006 U.S. Dist. LEXIS 59475, *12 (E.D. Pa. Aug. 18, 2006).) Ms. Davis argues that the cases cited by Defendants can be distinguished because each of the defendants therein was a contractor of the Commonwealth. In support of her argument that private entities which receive state funding may qualify as "public bodies" for purposes of the PWL, she cites Riggio v. Burns, 711 A.2d 497 (Pa. Super. Ct. 1998), and Denton v. Silver Stream Nursing & Rehabilitation Ctr., 739 A.2d 571 (Pa. Super. Ct. 1999). (Plf.'s Resp. at 6.)

The Court has carefully reviewed the cases cited by the parties and concludes Plaintiff has the better position. The Pennsylvania Supreme Court has not spoken on the precise question here, that is, how broadly to interpret the phrase "Any other body. . .which is funded in any amount by or through

24

Commonwealth or political subdivision authority." The cases cited by Defendants do share the common fact that the employers all were contractors of state entities, i.e., a cancer care clinic operated through Temple University in Cohen, a computer processing service that "performed governmental contracts" in Krajsa, and a computer service working for Northampton County in Brandau.

At the time Cohen was decided, the United States District Court for the Eastern District of Pennsylvania acknowledged that no Pennsylvania court had interpreted the phrase "funded by or through," but predicted that the Supreme Court of Pennsylvania would conclude that the legislature's use of those words had not been intended to bring a private agency under the purview of the PWL simply by the fact that it received Medicaid reimbursements. The district court reasoned that such an interpretation would be overly broad and would bring almost every health care provider in the Commonwealth under the statute. Cohen, 772 F. Supp. at 1526. The court held that application of the phrase should be limited to an entity which received "a specifically appropriated amount of State funds" for the purpose of aiding the agency in achieving public goals. It based this holding on the distinction between entities directly funded by the Commonwealth and those such as the clinic which was simply being reimbursed

25

for monies it had already expended on behalf of the patients, the true intended beneficiaries of the Medicaid program.   Id. at 1527.

In Krajsa, the Pennsylvania Superior Court gave fairly short shrift to the question of whether the plaintiff could invoke the PWL, simply stating that he "was not employed by a public body but by . . .a private company.  There is no evidence to suggest that the company was created or funded by a political body.  Although [the employer/defendant] performed governmental contracts, this is not sufficient to invoke the application of the Act."  Krajsa, 622 A.2d at 360.  Similarly, the court in Brandau, relying on Cohen and Krajsa, stated that a private entity such as ACS performing services under a contract does not qualify as being funded through the Commonwealth.  Brandau, 2006 U.S. Dist. LEXIS 59475 at *12.

By comparison, the plaintiffs in Riggio and Denton worked for entities that received funds directly from the Commonwealth. In Riggio, the plaintiff was an instructor in the neurology department of the Medical College of Pennsylvania who was initially not reappointed to her position and then fired after she complained about certain surgical practices of another physician.   Riggio, 711 A.2d at 498-499.  The college, relying on Cohen, argued that although it had received yearly

26

appropriations from the Commonwealth – including more than $4.5 million for fiscal year 1990-91 -- the phrase "funded" was ambiguous and should not be applied to itself. Therefore, the college was not a "public body" for purposes of the PWL and the whistleblower claim had been properly dismissed by the lower court. Id. at 500.

An *en banc* panel of the Pennsylvania Superior Court, noting that it was not bound by the federal court decision in Cohen, first distinguished that case because the college did not simply receive reimbursements from the state as did the cancer clinic in Cohen. Rather, the court wryly noted that when the college received specific appropriations from the Pennsylvania General Assembly, "[a] more direct and patent form of funding is difficult to imagine." Id. The court went only to point out that the statute provided an internal definition of the phrase "public body" which the Court was compelled to follow, stating:

> The statute plainly and unequivocally makes any body "funded in any amount by or through Commonwealth. . . authority" a public body for purposes of the Whistleblower Law. Where the language of a statute is unambiguous on its face, we are bound to give effect to that language. Parenthetically, we note that it is not unreasonable for the legislature to condition the receipt of state funds on the acceptance of the responsibilities embodied in the Whistleblower Law. Accordingly, as [the medical school] was clearly funded by the Commonwealth, we find it to be a public body as defined by the statute. Thus, the

Whistleblower Law applies to [Riggio] as an employee of a public body.

Riggio, 711 A.2d at 500 (internal citations omitted.)

Riggio is especially persuasive because the Superior Court in that case explicitly stated that the question before it was "the applicability of [the PWL] to a private medical institution which receives some funding from the Commonwealth." Id. at 498. By analogy, Point Park could be a private educational institution which receives "some funding" (not reimbursements) from the Commonwealth, although that it not clear from the Complaint.

The Superior Court also declined to follow Cohen in Denton v. Silver Hill. There, the plaintiff worked for a private nursing care facility which received funds through the Pennsylvania Department of Health and Human Services. When she complained about a variety of patient abuses to the Department, she was fired. Again relying on Cohen, the defendant argued it was not a public entity and therefore the PWL did not apply. The court disagreed, noting that "[o]ur own subsequent and binding state case law directs us to a different conclusion." Denton, 739 A.2d at 576, *citing* Riggio. Quoting the same language as in the previous paragraph about the intent of the

28

legislature when defining "public body," the court concluded

that

> [t]he plain meaning of the language of the statute
> makes it clear that it was intended to apply to all
> agencies that receive public monies under the
> administration of the Commonwealth. We do not find
> that legislatively appropriated funds are the only
> monies that will create "public body" status under the
> Whistleblower Law. The statutory language
> differentiates between appropriated and "pass-through"
> funds and extends the law to cover both types: "any
> other body which is. . .funded in any amount by or
> through Commonwealth. . . ." 43 P.S. § 1422. . . .The
> Law clearly indicates that it is intended to be
> applied to bodies that receive not only money
> appropriated *by* the Commonwealth, but also public
> money that passes *through* the Commonwealth.

Denton, 739 A.2d at 576 (emphasis in original.)

The Superior Court thus held -- in direct contradiction to
the holding of Cohen -- that "a recipient of Medicaid funding is
a 'public body' for purposes of the Whistleblower Law" and that
Denton's case had been erroneously dismissed by the lower court.
Id. at 576-577.

We are not, of course, discussing Medicaid funds in this
case, but rather some unspecified "Federal, **State** and
Institutional aid" subject to "federal, **state** and institutional
regulations and/or guidelines." (Complaint, ¶¶ 4, 6 (emphasis
added.)) Plaintiff, however, never alleges that Point Park
receives state funds either as a direct appropriation as in
Riggio or in the form of public monies that pass through the

29

Commonwealth as in Denton. The only source of funds explicitly identified is a federal source, i.e., the Federal Supplemental Educational Opportunity Grants from the Department of Education. In the current Complaint, a critical element of a PWL claim, i.e., that the University receives funds from the Commonwealth, is nothing more than an assertion "devoid of further factual enhancement." Dawson v. Frias, 2010 U.S. App. LEXIS 21278 at *2. We therefore grant Defendants' motion to dismiss Count II for failure to satisfy the pleading requirements of Twombly and Iqbal.

The Third Circuit Court of Appeals has cautioned, however, that it is error to dismiss a case out of hand without giving the plaintiff an opportunity to amend the complaint unless such an attempt would be inequitable or futile. Phillips, 515 F.3d at 236. If Ms. Davis is able to amend her complaint to clarify the source(s) of Commonwealth funding for Point Park, it may be that Count II will withstand further argument by Defendants that it should be dismissed.

An appropriate Order follows.

November __30__, 2010                  _William L. Standish_

William L. Standish
United States District Judge

30